## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| BURNING BROTHERS BREWING LLC, CHICAGO MAGIC LOUNGE LLC and CDC CATERING, INC. T/A BROOKSIDE MANOR, individually and on behalf of all others similarly situated, | Judge: _____ |
| Plaintiffs, | Civil Action No. _____ |
| v. | JURY TRIAL DEMANDED |
| THE CINCINNATI INSURANCE COMPANY, | |
| Defendant. | |

### PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs Burning Brothers Brewing LLC, Chicago Magic Lounge LLC and CDC Catering, Inc. T/A Brookside Manor (collectively "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide classes (collectively, the "Class"), bring this class action against Defendant The Cincinnati Insurance Company ("Cincinnati"), and in support thereof state the following:

### I.        NATURE OF THE ACTION

1.        Plaintiff Burning Brothers Brewing LLC owns and operates Burning Brothers Brewing, located in St. Paul, Minnesota. Burning Brothers Brewing is a microbrewery that specializes in producing gluten-free craft beer – never containing wheat, barley, or rye, in a dedicated gluten-free facility. Plaintiff Chicago Magic Lounge LLC owns and operates the Chicago Magic Lounge, located in Chicago's Andersonville neighborhood. The Chicago Magic Lounge is a bar and theatre that showcases parlor magic to an adult, nightlife audience by offering craft cocktails and small plates of handcrafted food. Plaintiff CDC Catering, Inc. T/A Brookside

Manor owns and operates Brookside Manor, an event space and catering service specializing in weddings, anniversaries, bar and bat mitzvahs, retirements, corporate meetings and other special events. But Plaintiffs' existence, however, is now threatened by SARS-CoV-2, sometimes called "Coronavirus" or by one of the names of the disease that it causes and that spreads it "COVID-19." For ease of reference, SARS-CoV-2 will be referred to as COVID-19 herein.

2.      Due to COVID-19, Plaintiffs' and the class members' properties have suffered "direct physical loss or damage"-under the plain and ordinary meaning of that term. Any jury would find that Plaintiffs have suffered a direct physical loss or damage because COVID-19 impaired Plaintiffs' property—COVID-19 made the property unusable in a way that it had been used before COVID-19.

3.       Instead of being able to pack customers into Burning Brothers Brewing to drink gluten-free craft beer, Burning Brothers at the very most can now only (1) sell beer to go, or (2) serve customers at a reduced capacity, each at least six feet apart. Similarly, Chicago Magic Lounge is also required to limit the number of patrons allowed into its theater at a reduced capacity and which is further constricted by requiring all patrons be seated in a socially distanced manner. Chicago Magic Lounge is also prohibited from serving alcohol after 11:00 p.m., effectively precluding its typical operations. Furthermore, because of the intimate size of its theater, in which the patrons are densely seated close to the stage to observe the magicians, Chicago Magic Lounge determined that it cannot feasibly put on its performances under such restrictions and has temporarily closed.  Similarly, ,  after being forced to discontinue its operations for nearly five months starting in  mid-March 2020 under the Pennsylvania Governor's closure orders, Brookside Manor was unable to host indoor events and gatherings of more than 25 people from mid-July 2020 through October 9, 2020.  Its maximum occupancy remains at 20% indoors and 25% outdoor and it is unable to serve alcohol past 11:00 p.m.  Clients are now unable to be seated closely

together or to congregate at the bar and/or dance floor and have largely either cancelled events altogether or significantly postponed them. For Plaintiffs to do otherwise would lead to the emergence of coronavirus at their properties. Until COVID-19 was brought a bit more under control, even these limited activities were not possible.

4.      This loss is "direct"—Plaintiffs are not asking the insurer to reimburse them after someone obtained a judgment against them for getting them sick. That might be an indirect loss. Rather, Plaintiffs are asking the insurer to pay for its loss of business income occasioned directly by being unable to use their properties.

5.      This loss is physical. Plaintiffs are unable to use their interior spaces in the manner in which they had previously used their interior spaces. The probability of illness prevents the use of the spaces in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[1]

6.      This loss is a loss. It is the loss of functionality of the spaces for business purposes. It is the diminishment of the physical spaces in the building. What once could hold many now can safely hold only a few.

7.      The United States District Court for the Western District of Missouri's decisions in *Studio 417, Inc. v. The Cincinnati Insurance Co.*, No. 6:20-cv-03127-SRB (W.D. Mo. Aug. 12, 2020) and *K.C. Hopps, LTD., The Cincinnati Insurance Company, Inc.,* Case No. 20-cv-00437-SRB (W.D. Mo. Aug. 12, 2020) collaterally estop Cincinnati from asserting that the impact of COVID-19 alleged above on Plaintiffs' properties does not constitute "direct physical loss or

---

[1] Note, however, that Plaintiffs are not seeking recovery for their loss of use. Plaintiffs are seeking coverage for their loss of business income. Here's an example that drives home the difference: some law firms have been unable to use their office space because of COVID-19, but nevertheless the law firms' business income has increased and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiffs' businesses have decreased because of the impairment of their business spaces, so Plaintiffs are seeking the loss of business income under the business interruption coverage of their property insurance policies.

damage." Cincinnati raised the identical argument in those cases and the court ruled against Cincinnati after providing Cincinnati a full and fair opportunity to litigate that issue. Similarly, Cincinnati is collaterally estopped from re-litigating the following identical issues in this case that were decided against Cincinnati in the Western District of Missouri cases: (1) the Plaintiffs state a claim for civil authority coverage under Cincinnati's policy; (2) the Plaintiffs state a claim for ingress and egress coverage under Cincinnati's policies; (3) the Plaintiffs state a claim for sue and labor coverage under Cincinnati's policies.

8.     To protect its businesses in the event that it suddenly had to suspend operations for reasons outside of its control, or if it had to act in order to prevent further property damage, Plaintiffs purchased insurance coverage from Cincinnati, including property coverage, as set forth in Cincinnati's Building and Personal Property Coverage Form (Form No. FM 101 05 16) ("Special Property Coverage Form").

9.     Cincinnati's Special Property Coverage Form provides "Business Income" coverage, which promises to pay for loss due to the necessary suspension of operations following loss to property.

10.     Cincinnati's Special Property Coverage Form also provides "Civil Authority" coverage, which promises to pay for loss caused by the action of a civil authority that prohibits access to the insured premises because of damage at other property.

11.     Cincinnati's Special Property Coverage Form also provides "Extra Expense" coverage, which promises to pay the expense incurred to minimize the suspension of business and to continue operations.

12.     Cincinnati's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that Cincinnati's insureds "must see that the following are done in order for coverage to apply. . . [t]ake all reasonable steps to protect the Covered

Property from further damage . . . . [and] [k]eep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This is commonly referred to as "Sue and Labor" coverage.

13.     Unlike many policies that provide Business Income coverage (also referred to as "business interruption" coverage), Cincinnati's Special Property Coverage Form does not include, and is not subject to, any exclusion for losses caused by the viruses.

14.     Plaintiffs were forced to suspend and/or substantially reduce business at their properties due to COVID-19 and the resultant closure orders issued by civil authorities in Minnesota, Illinois, and Pennsylvania.

15.     Indeed, Cincinnati has outright denied Plaintiffs' claims for coverage under their policies.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Defendant and at least one member of the Class are citizens of different states and because: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

17.     Venue is proper in this District under 28 U.S.C. § 1391, because Defendant resides in this District and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## III.     PARTIES

18.     Plaintiff Burning Brothers Brewing LLC is a Minnesota limited liability company with its principal place of business in St. Paul, Minnesota.

19.     Plaintiff Chicago Magic Lounge LLC is a Delaware limited liability company with

its principal place of business in Chicago, Illinois.

20.     Plaintiff CDC Catering Inc. T/A Brookside Manor is a Pennsylvania corporation with its principal place of business in Feasterville-Trevose, Pennsylvania.

21.     Defendant Cincinnati is an insurance company organized under the laws of Ohio, with its principal place of business in Fairfield, Ohio.  It is authorized to write, sell, and issue insurance policies providing property and business income coverage in all 50 states, as well as the District of Columbia and Puerto Rico.  At all times material hereto, Cincinnati conducted and transacted business through the selling and issuing of insurance policies within Ohio and across the country, including, but not limited to, selling and issuing property coverage to Plaintiffs.

## IV.     FACTUAL BACKGROUND

### A.     *The Special Property Coverage Form*

22.     In return for the payment of a premium, Cincinnati issued Policy No. ENP 042 70 41 to Chicago Magic Lounge for a policy period of March 1, 2020 to March 1, 2021, including a Businessowners Special Property Coverage Form.  Policy No. ENP 042 70 41 is attached hereto as Exhibit A.  Chicago Magic Lounge has performed all of its obligations under Policy No. ENP 042 70 41, including the payment of premiums.  The Covered Property, with respect to the Special Property Coverage Form, is Chicago Magic Lounge at 5050 N. Clark St., Chicago, Illinois 60640.

23.     In return for the payment of a premium, Cincinnati issued Policy No. ETA 031 58 42 to Burning Brothers Brewing for a policy period of March 1, 2020 to March 1, 2021, including a Businessowners Special Property Coverage Form.  Policy No. ETA 031 58 42 is attached hereto as Exhibit B.  Burning Brothers Brewing has performed all of its obligations under Policy No. ETA 031 58 42, including the payment of premiums.  The Covered Property, with respect to the Special Property Coverage Form, is Burning Brothers Brewing at 1750 Thomas Avenue, St. Paul, Minnesota 55104.

24. In return for the payment of a premium, Cincinnati issued Policy No. EPP 047 90 32 to Brookside Manor for a policy period of March 23, 2018 to March 23, 2021, including a Building and Personal Property Coverage Form (or "Special Property Coverage Form"). Policy No. EPP 047 90 32 is attached hereto as Exhibit C. Brookside Manor has performed all of its obligations under Policy No. EPP 047 90 32, including the payment of premiums. The Covered Property, with respect to the Special Property Coverage Form, is Brookside Manor at 50 Bustleton Pike, Feasterville-Trevose, Pennsylvania 19053.

25. In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (e.g., hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by Cincinnati, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded. In the Special Property Coverage Form provided to Plaintiffs, under the heading "Covered Causes of Loss," Cincinnati agreed to pay for direct loss to Covered Property "unless the loss is excluded or limited" by the policy.

26. In the Plaintiffs' policies, Cincinnati did not exclude or limit coverage for losses from the spread of viruses.

27. Losses due to COVID-19 are a Covered Cause of Loss under Cincinnati policies with the Special Property Coverage Form.

28. In the Special Property Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct physical loss or damage. A "slowdown or cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Cincinnati agreed to pay for loss of Business Income during the "period of restoration" that begins at the time of loss.

7

29. "Business Income" means net income (or loss) before tax that Plaintiffs and the other Class members would have earned or incurred, as well as continuing normal operating expenses incurred.

30. Plaintiffs' and the other Class members' properties have suffered direct physical loss or damage. Due to SARS-CoV-2 or COVID-19, their properties have become unsafe for their intended purpose and thus have suffered physical loss or damage. Their properties' business functions have been impaired. If they were to conduct business as usual, the disease and virus would show up and people would get sick. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty. It is a direct physical loss. In its current condition, Plaintiffs' and the other Class members' properties are not functional for their business purposes.

31. The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006, as has happened here. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

32.     In the Special Property Coverage Form, Cincinnati also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct loss to the Covered Property.

33.     "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

34.     Cincinnati also agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain and necessary Extra Expense "caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property, the civil authority prohibits access to property immediately surrounding the damaged property, the Covered Property is within the prohibited area, and the civil authority action is taken "in response to dangerous physical conditions."

35.     Cincinnati's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that Cincinnati's insureds "must see that the following are done in order for coverage to apply. . . [t]ake all reasonable steps to protect the Covered Property from further damage . . . . [and] [k]eep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This is commonly referred to as "Sue and Labor" coverage.

36.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, Civil Authority, and Sue and Labor provisions of the Cincinnati policies.

37.     Indeed, many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders. *See* N.Y.C. Emergency Exec. Order No. 100,

at 2 (Mar. 15, 2020)[2] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103 at 1 (Mar. 25, 2020)[3] (recognizing the "actions taken to prevent such spread [of COVID-19] have led to property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)[4] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[5] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[6] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[7] (COVID-19 is "physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[8] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[9] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the

[2] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf
[3] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf
[4] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf
[5] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf
[6] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order
[7] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf (last visited September 20, 2020).
[8] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF
[9] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[10] (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't. of Public Health & Env't., Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[11] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. To San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[12] ("This order and the previous orders issued during this emergency have been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); and City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[13] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property").

**B.**     *The Covered Cause of Loss*

38.     The spread and presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses (the "Closure Orders").

**1.**     **The Closure Orders**

**a.**     **The Illinois Closure Orders**

---

[10] https://www.hillsboroughcounty.org/library/hillsborough/media-center/
documents/administrator/epg/saferathomeorder.pdf
[11] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620
[12] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf
[13] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-
Amdmt-3-25-20_FINAL

39.     On March 9, 2020, Illinois Governor J.B. Pritzker issued a disaster proclamation for the entire state of Illinois.

40.     On March 16, 2020, Governor Pritzker issued an executive order that closed all bars and restaurants except for carry out and delivery services and prohibited gatherings larger than 50 people until March 30, 2020.

41.     On March 20, 2020, Governor Pritzker issued a statewide stay at home order that closed all nonessential businesses until April 7, 2020.

42.     On April 1, 2020, Governor Pritzker extended the stay at home order, as well as the executive order closing restaurants and bars to April 30, 2020.

43.     On April 30, 2020, Governor Pritzker extended the stay at home order, as well as the executive order closing restaurants and bars to May 29, 2020.

44.     After the executive order closing restaurants and bars was extended to cover most of the month of June, on June 26, 2020, Governor Pritzker allowed restaurants and bars to reopen at 50 percent capacity.

45.     The Illinois Closure Orders were issued in response to the rapid spread of COVID-19 throughout Illinois.

**b.      The Minnesota Closure Orders**

46.     On March 13, 2020, Minnesota Governor Tim Walz issued Emergency Executive Order 20-01, "Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19."  Governor Walz encouraged individual Minnesotans to continue "their individual prevention efforts such as staying home when feeling sick, frequently washing their hands, and monitoring information about COVID-19."

12

47.     On March 16, 2020, the State of Minnesota issued a civil authority order requiring the closure of bars in Minnesota and banning dine-in eating in Minnesota. This order has been in effect since March 16, 2020.

48.     On March 25, 2020, the State of Minnesota issued a civil authority order requiring the closure of non-essential businesses, which includes bars, pubs, and beer breweries. This order has been in effect since March 25, 2020.

49.     The Minnesota Closure Orders were issued in response to the rapid spread of COVID-19 throughout Minnesota.

**c.      The Pennsylvania Closure Orders**

50.     On March 6, 2020, the Commonwealth of Pennsylvania Governor Tom Wolf issued a proclamation of disaster emergency for the entire Commonwealth of Pennsylvania.

51.     On March 19, 2020, Governor Wolf issued a civil authority order requiring the closure of all but "life-sustaining" businesses, which included Brookside Manor.

52.     On March 15, 2020, Governor Wolf issued a civil authority order directing all restaurants and bars to close their dine-in facilities and services while allowing them to provide carry-out, drive-through and/or delivery services.

53.     On March 23, 2020, Governor Wolf issued the first Pennsylvania "Stay at Home" Order which was later extended statewide. For Bucks County (where Brookside Manor is located), the Stay at Home Order was in effect through June 4, 2020.

54.     On June 4, 2020 Governor Wolf issued a civil authority order that moved Bucks County into Pennsylvania's "Yellow Phase" of reopening thereby relaxing certain restrictions like the Stay at Home Order and the ban on non-life sustaining travel. In addition, the order allowed restaurants and bars to resume outdoor dining at fifty percent (50%) occupancy. However, the order continued to require indoor recreation and entertainment businesses to remain closed.

55.     It was not until June 26, 2020, that Bucks County was added to the "Green Phase" of Pennsylvania's reopening plan.  Under the order, venues hosting events or gatherings of up to 250 people were permitted if outdoors, but only groups of twenty-five (25), were permitted indoors.

56.     Subsequently, on July 15, 2020, Governor Wolf and Secretary of Health Rachel Levine issued orders pertinent to businesses in the retail food services industry, including private caterers, bars and restaurants, which prohibited bars from operating without sit-down, dine in meals or take-out sales of alcoholic beverages.  The occupancy requirements limited private catered events to 25 persons, inclusive of staff.

57.     Most recently, on October 8, 2020, Governor Wolf issued an executive order under which the permissible occupancy calculation rate is 20% maximum occupancy indoors and 25% maximum occupancy outdoors at events hosting between 0-2,000 people for venues hosting events or gatherings with an applicable National Fire Protection Association occupancy limit and 67 people per 1000 square feet for venues without an applicable fire code limit.

58.     Social distancing, masking, and other mitigation measures (including multiple exit and entry points, restrooms and hygiene stations) are mandatory and alcohol can only be served for on-premises consumption in the same transaction as a meal.

59.     The Pennsylvania Closure Orders were issued in response to the rapid spread of COVID-19 throughout Pennsylvania.

**2.      The Physical Presence and Demonstrable Impact of COVID-19 and     the Closure Orders**

60.     The presence of COVID-19 caused direct physical loss of or damage to the covered properties under the Plaintiffs' policies, and the policies of the other Class members, by: (i) causing direct physical loss of or damage to the covered properties; (ii) denying use of and damaging the

14

covered properties; (iii) requiring physical repair and/or alterations to the covered properties; and/or (iv) causing a necessary suspension of operations during a period of restoration.

61.     Because of the spread or presence of COVID-19, the air in Plaintiffs' properties has become unsafe, necessitating repairs and alterations such as Plaintiff Chicago Magic Lounge's installation of: (i) a plexiglass screen in their box office window to separate patrons from staff using epoxy on walnut woodwork; (ii) multiple plexiglass screens measuring three (3) feet or more in height in the banquet seating area of their main stage theatre to separate patrons from one another using epoxy on terrazzo flooring and walnut woodwork (which also significantly diminishes the space of the main stage theatre and significantly impedes the ingress, egress and general mobility and interaction between guests, staff and performers); and (iii) a HEPA filter to the air intake portion of their HVAC system.

62.     Similarly, the direct physical loss of or damage to Brookside Manor's premises is evidenced by numerous repair and alterations throughout its indoor space, including the installation of: (i) plexiglass screens at the food service and beverage stations to separate servers from guests and (ii) hands free soap dispensers and faucets in the restrooms. Brookside Manor has also erected signage regarding mask wearing and social distancing and sanitizing stations throughout.

63.     Further, the functional space in Plaintiffs' buildings has been diminished by the spread and/or presence of COVID-19.

64.     Plaintiff Chicago Magic Lounge has lost their normal functionality and their space has been diminished by COVID-19. In addition to the multiple plexiglass screens installed in Chicago Magic Lounge's banquet seating area as discussed supra in paragraph 58, they have also been forced to completely close public access to one of their performance venues because it had fixed seating and could not be altered in any way to safely permit occupancy by patrons and to remove fifty (50) chairs and numerous tables from the floor of their main stage theatre including

15

all front row seating (the most prized and expensive ticketed seating in the theatre) to safely accommodate patrons.

65.     The fact that Brookside Manors space has also substantially lost its functionality and is unable to be used for its intended business purpose because of COVID-19 is evidenced by the substantial reduction and movement of chairs and tables made available to guests as well as the need to rent tents and heat lamps for outdoor events and to have obtained a variance from the Pennsylvania Liquor Control Board to serve alcohol at outdoor events.

66.     In addition to being forced to discontinue operations from March to July 2020 and experiencing a subsequent reduced indoor capacity of 25 persons and outdoor capacity of 250 persons for several months, Brookside Manor still remains unable to safely operate near even close to capacity.

67.     Not only has the air inside Plaintiff Burning Brothers Brewing's property become unsafe as well, so too has their property lost its normal functionality and its space been diminished by COVID-19. As a result, Burning Brothers Brewing has also been forced to make necessary repairs and alterations to their property as evidenced by the installation of plexiglass at their points of sale and by the restructuring and installation of hardware in their taproom to encourage outdoor use by customers and to further promote and comply with social distancing requirements.

68.     All three named Plaintiffs have purchased and incurred sizable sums on various forms of Personal Protective Equipment such as face masks for employees, disposable gloves and professional grade cleaning equipment and performed extensive cleaning measures at an increased frequency.

69.     Thus, there have been many obvious structural alterations, repairs and/or changes to the Premises and Plaintiffs' operations, and those similarly situated, in order for each insured

location to continue its business operations after experiencing direct property damage which was caused by COVID-19 and to avoid the imminent threat of further property damage.

70.     Additionally, the Closure Orders, including the issuance of the Illinois, Minnesota and Pennsylvania Closure Orders, prohibited access to Plaintiffs' and the other Class members' Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a Covered Cause of Loss.

71.     As a result of the presence of COVID-19 and the Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expense.

72.     Plaintiffs submitted claims for loss to Cincinnati under their policies due to the presence of COVID-19 and the Closure Orders, and Cincinnati denied those claims.

## V.     CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

74.     Plaintiffs seek to represent nationwide classes defined as:

- All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Cincinnati; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Cincinnati property insurance policy; (c) made a claim under their property insurance policy issued by Cincinnati; and (d) were denied Business Income coverage by Cincinnati for the suspension of business resulting from the presence or threat of COVID-19 (the "Business Income Breach Class").

- All persons and entities that: (a) had Civil Authority coverage under a property insurance policy issued by Cincinnati; (b) suffered loss of Business Income and/or Extra Expense caused by action of a civil authority; (c) made a claim under their property insurance policy issued by Cincinnati; and (d) were denied Civil Authority coverage by Cincinnati for the loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Breach Class").

17

- All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Cincinnati; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Cincinnati property insurance policy; (c) made a claim under their property insurance policy issued by Cincinnati; and (d) were denied Extra Expense coverage by Cincinnati despite their efforts to minimize the suspension of business caused by COVID-19 (the "Extra Expense Breach Class").

- All persons and entities that: (a) had a Sue and Labor provision under a property insurance policy issued by Cincinnati; (b) sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their Cincinnati property insurance policy; (c) made a claim under their property insurance policy issued by Cincinnati; and (d) were denied Sue and Labor coverage by Cincinnati in connection with the suspension of business caused by COVID-19 (the "Sue and Labor Breach Class").

- All persons and entities with Business Income coverage under a property insurance policy issued by Cincinnati that suffered a suspension of business due to COVID-19 at the premises covered by the business income coverage (the "Business Income Declaratory Judgment Class").

- All persons and entities with Civil Authority coverage under a property insurance policy issued by Cincinnati that suffered loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

- All persons and entities with Extra Expense coverage under a property insurance policy issued by Cincinnati that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Cincinnati property insurance policy (the "Extra Expense Declaratory Judgment Class").

- All persons and entities with a Sue and Labor provision under a property insurance policy issued by Cincinnati that sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their Cincinnati property insurance policy (the "Sue and Labor Declaratory Judgment Class").

75. Excluded from each defined Class is Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities;

18

and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

76. This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

77. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of each defined Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

78. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

   a. Cincinnati issued all-risk policies to the members of the Class in exchange for payment of premiums by the Class members;

   b. whether the Class suffered a covered loss based on the common policies issued to members of the Class;

   c. whether Cincinnati wrongfully denied all claims based on COVID-19;

   d. whether Cincinnati's Business Income coverage applies to a suspension of business caused by COVID-19;

e. whether Cincinnati's Civil Authority coverage applies to a loss of Business Income caused by the orders of state governors requiring the suspension of business as a result of COVID-19;

f. whether Cincinnati's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

g. whether Cincinnati's Sue and Labor provision applies to require Cincinnati to pay for efforts to reduce damage caused by COVID-19;

h. whether Cincinnati has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

i. whether Plaintiffs and the Class are entitled to an award of reasonable attorney fees, interest and costs.

79. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members are all similarly affected by Defendant's refusal to pay under its Business Income, Civil Authority, Extra Expense, and Sue and Labor coverages. Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

80. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who it seeks to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously.

20

The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

81.     **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).**  Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Income, Civil Authority, Extra Expense, and Sue and Labor coverages.  The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant.  Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

82.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

83.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT -- BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the Business Income Breach Class)**

84.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

85.    Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Breach Class.

86.    Plaintiffs' Cincinnati policies, as well as those of the other Business Income Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Business Income Breach Class members' losses for claims covered by the policy.

87.    In the Special Property Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

88.    A "slowdown or cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Cincinnati agreed to pay for loss of Business Income during the "period of restoration" that begins at the time of loss.

89.    "Business Income" means net income (or loss) before tax that Plaintiffs and the other Class members would have earned or incurred, as well as continuing normal operating expenses incurred.

90.    COVID-19 caused direct loss to Plaintiffs' and the other Business Income Breach Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiffs' and the other Business Income Breach Class members' Cincinnati policies.

91.     Plaintiffs and the other Business Income Breach Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

92.     By denying coverage for any Business Income losses incurred by Plaintiffs and the other Business Income Breach Class members in connection with the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

93.     As a result of Cincinnati's breaches of the policies, Plaintiffs and the other Business Income Breach Class members have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the Civil Authority Breach Class)**

94.     Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

95.     Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Breach Class.

96.     Plaintiffs' Cincinnati insurance policies, as well as those of the other Civil Authority Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Civil Authority Breach Class members' losses for claims covered by the policy.

97.     Cincinnati agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain "and any Extra Expense caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property other than Covered Property, the civil authority prohibits access to property immediately surrounding the damaged

23

property, the Covered Property is within the prohibited area, and the civil authority action is taken "in response to dangerous physical conditions."

98.     Here, a covered cause of loss, COVID-19, resulted in direct physical loss and damage to property other than Covered Property in the same manner, as described above, that it resulted in direct physical loss and damage to Covered Property. Because of that loss and damage, civil authority action was taken that prohibited access to property immediately surrounding the damaged property and Covered Property was in this prohibited area.

99.     The Closure Orders triggered the Civil Authority provision under Plaintiffs' and the other members of the Civil Authority Breach Class's Cincinnati insurance policies.

100.    Plaintiffs and the other members of the Civil Authority Breach Class have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

101.    By denying coverage for any business losses incurred by Plaintiffs and other members of the Civil Authority Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

102.    As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Civil Authority Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Extra Expense Breach Class)**

103.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

104.    Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Breach Class.

105.    Plaintiffs' Cincinnati insurance policies, as well as those of the other Extra Expense Breach Class members, are contracts under which Cincinnati insurance was paid premiums in exchange for its promise to pay Plaintiffs' and the other Extra Expense Breach Class members' losses for claims covered by the policy.

106.    In the Special Property Coverage Form, Cincinnati also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

107.    "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

108.    Due to COVID-19 and the Closure Orders, Plaintiffs and the other members of the Extra Expense Breach Class incurred Extra Expense at Covered Property

109.    Plaintiffs and the other members of the Extra Expense Breach Class have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

110.    By denying coverage for any business losses incurred by Plaintiffs and the other members of the Extra Expense Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

111.    As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Extra Expense Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

### COUNT IV
### BREACH OF CONTRACT – SUE AND LABOR COVERAGE
**(Claim Brought on Behalf of the Sue and Labor Breach Class)**

112.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

113.    Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Breach Class.

114.    Plaintiffs' Cincinnati policies, as well as those of the other Sue and Labor Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Sue and Labor Breach Class members' losses for claims covered by the policy.

115.    In the Special Property Coverage Form, Cincinnati agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

116.    In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs and other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property.

117.    Plaintiffs and the other members of the Sue and Labor Breach Class have complied with all applicable provisions of the policy and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

118.    By denying coverage for any Sue and Labor expenses incurred by Plaintiffs and the other members of the Sue and Labor Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

119.    As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Sue and Labor Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

**COUNT V**
**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the Business Income Declaratory Judgment Class)**

26

120.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

121.    Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

122.    Plaintiffs' Cincinnati policies, as well as those of the other Business Income Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Business Income Declaratory Judgment Class members' losses for claims covered by the policy.

123.    Plaintiffs and the other Business Income Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Business Income Declaratory Judgment Class members are entitled.

124.    Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

125.    An actual case or controversy exists regarding Plaintiffs' and the other Business Income Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs for the full amount of Business Income losses incurred by Plaintiffs and the other Business Income Declaratory Judgment Class members in connection with the suspension of their businesses stemming from the COVID-19 pandemic.

126.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Business Income Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

i.    Plaintiffs' and the other Business Income Declaratory Judgment Class members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

ii.   Cincinnati is obligated to pay Plaintiffs and the other Business Income Declaratory Judgment Class members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT VI
## DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
### (Claim Brought on Behalf of the Civil Authority Declaratory Judgment Class)

127.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

128.    Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Declaratory Judgment Class.

129.    Plaintiffs' Cincinnati insurance policies, as well as those of the other Civil Authority Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Civil Authority Declaratory Judgment Class members' losses for claims covered by the policy.

130.    Plaintiffs and the other Civil Authority Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

131.     Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

132.     An actual case or controversy exists regarding Plaintiffs' and the other Civil Authority Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Civil Authority Declaratory Judgment Class members for the full amount of covered Civil Authority losses incurred by Plaintiffs and the other Civil Authority Declaratory Judgment Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

133.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

   i.   Plaintiffs' and the other Civil Authority Declaratory Judgment Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

   ii.  Cincinnati is obligated to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VII**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Extra Expense Declaratory Judgment Class)**

134.     Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

135. Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

136. Plaintiffs' Cincinnati insurance policies, as well as those of the other Extra Expense Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Extra Expense Declaratory Judgment Class members' losses for claims covered by the policy.

137. Plaintiffs and the other Extra Expense Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

138. Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

139. An actual case or controversy exists regarding Plaintiffs' and the other Extra Expense Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of Extra Expense losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

140. Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Extra Expense Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

     i.    Plaintiffs' and the other Extra Expense Declaratory Judgment Class members' Extra Expense losses incurred in connection with the Closure Orders and the

necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

ii.  Cincinnati is obligated to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VIII**
**DECLARATORY JUDGMENT – SUE AND LABOR COVERAGE**
**(Claim Brought on Behalf of the Sue and Labor Declaratory Judgment Class)**

141.  Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

142.  Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Declaratory Judgment Class.

143.  Plaintiffs' Cincinnati insurance policies, as well as those of the other Sue and Labor Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs' and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property.

144.  Plaintiffs and the other Sue and Labor Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

145.     Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

146.     An actual case or controversy exists regarding Plaintiffs' and the other Sue and Labor Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Sue and Labor Declaratory Judgment Class members for the full amount Plaintiffs and the other members of the Sue and Labor Declaratory Judgment Class reasonably incurred to protect Covered Property from further damage by COVID-19.

147.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Sue and Labor Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    i.    Plaintiffs' and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their policies; and

    ii.    Cincinnati is obligated to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class members for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.     Entering an order certifying the proposed nationwide Classes, as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned attorneys as Counsel for the Classes;

b.     Entering judgment on Counts I-IV in favor of Plaintiffs and the members of the Business Income Breach Class, the Civil Authority Breach Class, the Extra Expense Breach Class,

and the Sue and Labor Breach Class; and awarding damages for breach of contract in an amount
to be determined at trial;

     c.     Entering declaratory judgments on Counts V-VIII in favor of Plaintiffs and the
members of the Business Income Declaratory Judgment Class, the Civil Authority Declaratory
Judgment Class, the Extra Expense Declaratory Judgment Class, and the Sue and Labor
Declaratory Judgment Class as follows:

          i.     Business Income, Civil Authority, Extra Expense, and Sue and Labor losses
incurred in connection with the Closure Orders and the necessary interruption
of their businesses stemming from the COVID-19 pandemic are insured losses
under their policies; and

          ii.     Cincinnati is obligated to pay for the full amount of the Business Income, Civil
Authority, Extra Expense, and Sue and Labor losses incurred and to be incurred
related to COVID-19, the Closure Orders and the necessary interruption of their
businesses stemming from the COVID-19 pandemic;

     d.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts
awarded;

     e.     Ordering Defendant to pay attorneys' fees and costs of suit; and

     f.     Ordering such other and further relief as may be just and proper.

## VIII.  JURY DEMAND

     Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  November 12, 2020          Respectfully submitted,

                        */s/ Kenneth P. Abbarno*
                        Kenneth P. Abbarno
                        Mark A. DiCello
                        Mark Abramowitz
                        **DiCELLO LEVITT GUTZLER LLC**

7556 Mentor Avenue
Mentor, Ohio 44060
Telephone: 440-953-88
kabbarno@dicellolevitt.com
madicello@dicellolevitt.com
mabramowitz@dicellolevitt.com

Adam J. Levitt*
Amy E. Keller*
Daniel R. Ferri*
Mark Hamill*
Laura E. Reasons*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Mark Lanier*
Alex Brown*
Skip McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

34

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

Robert J. Mongeluzzi
Jeffrey P. Goodman
Marni S. Berger
Samuel B. Dordick
**SALTZ MONGELUZZI & BENDESKY, P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Telephone: 215-496-8282
rmongeluzzi@smbb.com
hgoddman@smbb.com
sdordick@smbb.com

Bryan L. Bleichner
**CHESTNUT CAMBRONNE, PA**
17 Washington Avenue North, Suite 2200
Minneapolis, Minnesota 55401
Telephone: 612-339-7300
bbleichner@chestnutcambronne.com

*Counsel for Plaintiffs*
*and the Proposed Classes*

*Applications for admission *pro hac vice* to be filed