**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| TROY STACY ENTERPRISES INC., | : | Master Case No. 1:20-cv-312 |
| SWEARINGEN SMILES LLC, ELEISHA J. | : | (Consolidated) |
| NICKOLES DDS, REEDS JEWELERS OF | : | |
| NIAGARA FALLS, INC., BURNING | : | Judge Matthew W. McFarland |
| BROTHERS BREWING LLC, CHICAGO | : | |
| MAGIC LOUNGE LLC, AND CDC | : | |
| CATERING, INC. T/A BROOKSIDE | : | |
| MANOR, individually and on behalf of all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CINCINNATI INSURANCE | : | |
| COMPANY, THE CINCINNATI | : | |
| CASUALTY COMPANY, THE | : | |
| CINCINNATI INDEMNITY COMPANY, | : | |
| AND CINCINNATI FINANCIAL | : | |
| CORPORATION, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| **This Documents Relates to: All actions** | : | |

_____

**ORDER GRANTING MOTION TO DISMISS AND**
**DENYING MOTION TO STAY AS MOOT**
_____

These consolidated actions arise from business closures related to the COVID-19 pandemic and the resulting economic shutdowns. After the Court consolidated these claims (Doc. 57), Plaintiffs filed a Consolidated Amended Class Action Complaint (Doc. 61). Now before the Court are motions to dismiss (Doc. 63) and to stay (Doc. 66) filed by Defendants (collectively, "Cincinnati").

Because neither the presence of SARS-CoV-2 or COVID-19 in the insured property nor the government closure orders constitute "direct accidental physical loss or accidental physical damage," the Court grants the motion to dismiss and denies the motion to stay as moot.

## FACTUAL ALLEGATIONS

The plaintiffs, like so many of the rest of us the past year and a half, have endured significant burdens because of the SARS-CoV-2 virus, commonly known as novel coronavirus, and the disease it causes, COVID-19. (*See* Am. Compl., Doc. 61, ¶ 10.) Among the pandemic's many other consequences, interruptions in commerce have caused businesses significant losses in profits. In these consolidated actions, seven plaintiff businesses seek insurance coverage from their insurer for "direct physical loss or damage" to their property. (*See id.* at ¶¶ 11, 22-32.) The plaintiffs hail from mostly different states and run mostly different kinds of businesses:

1. CDC Catering, Inc., trading as Brookside Manor, is an event space and catering service in Feasterville-Trevose, Pennsylvania. (*Id.* at ¶¶ 9, 43.)

2. Reeds Jewelers of Niagara Falls, Inc., owns and operates seven jewelry and watch retail outlets in New York, and one in Massachusetts. (*Id.* at ¶ 6.) It is incorporated under the laws of New York. (*Id.* at ¶ 40.)

3. Troy Stacy Enterprises Inc. owns and operates Craft & Vinyl, a craft beer pub, vinyl record shop, and live music venue in Columbus, Ohio. (*Id.* at ¶¶ 3, 37.)

4. Swearingen Smiles LLC is a dentists' office in East Liverpool, Ohio. (*Id.* at ¶¶ 4, 38.)

2

5. Chicago Magic Lounge is a bar and theatre that showcases parlor magic for adults and offers food and drinks. (*Id.* at ¶ 8.) It is a Delaware limited liability company. Its principal place of business is in Chicago, Illinois. (*Id.* at ¶ 42.)

6. Burning Brothers Brewing LLC is a microbrewery that makes gluten-free beer in St. Paul, Minnesota. (*Id.* at ¶¶ 7, 41.)

7. Eleisha Nickoles, DDS, is a dentist who maintains an office in Wheeling, West Virginia. (*Id.* at ¶¶ 5, 39.)

Though they run different kinds of businesses, Plaintiffs have all been forced to reduce or suspend their operations due to the COVID-19 pandemic. (*See id.* at ¶ 12.) The virus has allegedly contaminated their properties. (*Id.* at ¶ 204.) People who have been present on insured property have tested positive for COVID-19. (*Id.* at ¶¶ 179, 193-99.) Since the virus poses a threat to people's health, the businesses have had to disinfect and reconfigure their commercial spaces. (*See id.* at ¶¶ 93, 94.) And, in response to the COVID-19 pandemic, Plaintiffs' state and local governments ordered extensive shutdowns. (*Id.* at ¶¶ 120-165.) In short, because of COVID-19 and the resulting shutdown orders, Plaintiffs could not run their businesses as they normally would. (*Id.* at ¶¶ 185-192.)

Plaintiffs all had insurance policies with Cincinnati. (*Id.* at ¶¶ 47-53.) In those policies, Cincinnati agreed to provide coverage for lost "Business Income":

> We will pay for the actual loss of "Business Income" . . . you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

3

(*E.g.*, Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3011; Swearingen Smiles Policy, Doc. 61-2, Pg. ID 3154; Eleisha Nickoles DDS Policy, Doc. 61-3, Pg. ID 3374.) "Covered Cause of Loss" means "direct 'loss' unless the 'loss' is excluded or limited." (*E.g.*, Craft & Vinyl Policy, Doc. 61-1, Pg. ID 2998; Brookside Manor Policy, Doc. 61-7, Pg. ID 4929.) The policies define "loss" as "accidental physical loss or accidental physical damage." (*E.g.*, Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3031; Brookside Manor Policy, Doc. 61-7, Pg. ID 4962.) The policies also provide for "Extra Expense" coverage and "Civil Authority" coverage. "Extra Expense" refers to necessary expenses an insured sustains during a "period of restoration" which would not have been incurred had there been no direct loss to property. (Am. Compl., Doc. 61, ¶¶ 64-65; Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3012.) "Civil Authority" coverage is available when, among other conditions, a loss causes damage to property other than the insured property and a civil authority prohibits access to the insured premises. (Am. Compl., Doc. 61, ¶ 66; Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3012.)

Plaintiffs sought coverage under the "Business Income," "Extra Expense," and "Civil Authority" provisions. Cincinnati denied coverage. (Am. Compl., Doc. 61, ¶¶ 214-16.) These lawsuits followed. The Court consolidated them in January 2021. *Troy Stacy Enterprises Inc. v. Cincinnati Ins. Co.*, 337 F.R.D. 405, 408 (S.D. Ohio 2021). Plaintiffs bring four claims for breach of contract, seeking business income coverage, civil authority coverage, extra expense coverage, and sue-and-labor coverage. They also bring four claims for declaratory judgment under the same four coverage provisions.

4

## LAW AND ANALYSIS

The Federal Rules of Civil Procedure allow, upon motion, the dismissal of a complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. R. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the plaintiff's cause of action as stated in the complaint. *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). The Court accepts the complaint's factual allegations as true. It is not bound to do the same for a complaint's legal conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, surviving a motion to dismiss is a matter of pleading sufficient factual content. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 683 (2009)).

A claim for relief must be "plausible on its face." *Iqbal,* 556 U.S. at 678. That is, the complaint must lay out enough facts for a court to reasonably infer that the defendant wronged the plaintiff. *16630 Southfield*, 727 F.3d at 502. A complaint that lacks such plausibility warrants dismissal. *Iqbal,* 556 U.S. at 678. While "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

Because six states' laws are potentially at play in this consolidated matter, the Court begins with a conflicts of law analysis before proceeding to the question of whether any of the plaintiffs have stated claims for relief.

## I. Conflicts of Law

Cincinnati appears to concede that the laws of Pennsylvania, New York, Ohio,

Illinois, Minnesota, and West Virginia "potentially apply" but cites mostly Ohio law. (Motion to Dismiss, Doc. 63, Pg. ID 5178.) Yet it revises this position in its Reply and maintains that Ohio law controls. (Reply, Doc. 71, Pg. ID 5506.) Plaintiffs assert that the various states' laws apply, noting that some states handle contractual ambiguities differently and that Pennsylvania and West Virginia apply the reasonable expectations doctrine. (Memorandum in Opposition (MIO), Doc. 63, Pg. ID 5438.)

A federal court exercising its diversity jurisdiction applies the conflicts of law rules of the state where it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). In Ohio, courts facing conflicts of law questions resort to the Restatement (Second) of the Law of Conflicts. *Gries Sports Enterprises, Inc. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984) (§ 188 applies when the parties have not designated a choice of applicable law); *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.*, 453 N.E.2d 683, 686 (Ohio 1983) (§ 187 applies when the parties have agreed to a choice of law provision). *See also Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 949 (S.D. Ohio 2002). The parties do not point to any choice of law provision in the insurance policies, so the Court applies § 188 of the Restatement. *Id.* at 949-50.

Section 188 states that the parties' rights and duties regarding a contractual issue are determined by the law of the state that "has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188(1) (1971). When the parties have not designated which state's law applies, the court considers the place of contracting, the place where the parties negotiated the contract, the place of

6

performance, the location of the subject matter of the contract, and the residence and place of incorporation and place of business of the parties. *Id.* at § 188(2).

There is evidence tending to show that the plaintiffs contracted and negotiated their insurance policies in their own states with local agencies. (*E.g.*, Reeds Jewelers Policy, Doc. 61-4, CIC 1; Eleisha Nickoles DDS Policy, Doc. 61-3, Pg. ID 3338; Brookside Manor Policy, Doc. 61-7, Pg. ID 4887.) Those factors cut in favor of applying the law of each plaintiff's state of residence. Next is the place of performance; in insurance cases, the place where an insurance policy is performed is the place where the insurance benefits are (or would be) paid. *See Allstate Fire & Cas. Ins. Co. v. Moore*, 993 N.E.2d 429, 436 (Ohio Ct. App. 2013). Here, that would be the address of the insured businesses as reflected in the declarations page of their respective insurance policies—in other words, the state where each plaintiff resides. As for the location of the subject matter, that factor can be "quite important" in insurance cases. *See Jamhour*, 211 F. Supp. 2d at 951. And, here, these plaintiffs bought insurance policies to protect goods located in their states of residence. *Id.* That tilts the balance in favor of applying the law of each plaintiff's state of residence. Since the first four factors weigh in favor of applying the laws of the various states represented here, including the particularly weighty subject-matter factor, we need not reach the final factor. The Court will consider the applicable state laws of Pennsylvania, New York, Ohio, Illinois, Minnesota, and West Virginia, as they relate to each plaintiff.

## II. Business Income Coverage

These contractual disputes are over whether the presence and contamination of

7

SARS-CoV-2 on insured property or the resulting governmental shutdown orders constitute "direct accidental physical loss or accidental physical damage." The parties agree that business income coverage depends on the answer to that question. (MIO, Doc. 67, Pg. ID 5440, n. 3; Reply, Doc. 71, Pg. ID 5518, n. 5.)

All of the state laws involved here hold to the traditional principles of contract interpretation. A court's primary goal in construing a written contract is to give effect to the parties' intent. *Tria WS LLC v. Am. Auto. Ins. Co.*, --- F. Supp. 3d ---, No. CV 20-4159, 2021 WL 1193370, at *2 (E.D. Pa. Mar. 30, 2021); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, --- F. Supp. 3d ---, No. 20-CV-3418, 2021 WL 860345, at *2 (S.D.N.Y. Mar. 6, 2021); *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 520 (W. Va. 2013); *W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011); *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006); *Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004). We presume that the contract language conveys the parties' intent. *Saunders*, 801 N.E.2d at 454; *Tria*, --- F. Supp. 3d ---, 2021 WL 1193370, at *2; *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, 488 F. Supp. 3d 690, 693 (N.D. Ill. 2020); *Bachman's Inc. v. Florists Mut. Ins. Co.*, --- F. Supp.3d ---, No. CV 20-2399, 2021 WL 981246, at *1 (D. Minn. Mar. 16, 2021); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 881 (S.D. W. Va. 2020); *Food for Thought*, --- F. Supp. 3d ---, 2021 WL 860345, at *2.

Clear and unambiguous terms in an insurance policy bear their plain and ordinary meaning. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 843 (7th Cir. 2013); *Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 901 (W. Va. 2009); *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019 (N.Y. 2007); *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa.

8

1999); *Olmstead v. Lumbermens Mut. Ins. Co.*, 259 N.E.2d 123, 126 (Ohio 1970); *Bobich v. Oja*, 104 N.W.2d 19, 20 (Minn. 1960). Terms are not necessarily ambiguous just because the policy does not define them; dictionary definitions suffice to show what an undefined term means. *Poehler v. Cincinnati Ins. Co.*, 899 N.W.2d 135, 141 (Minn. 2017); *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 81 (N.Y. 2015); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Miller*, 724 S.E.2d 343, 352 (W. Va. 2012); *Valley Forge*, 860 N.E.2d at 316; *Madison Const.*, 735 A.2d at 108; *Olmstead*, 259 N.E.2d at 126.

### A. No coverage under any applicable state law

Plaintiffs allege that the virus contaminated their insured properties. (Am. Compl., Doc. 61, ¶¶ 198-200, 204-05, 208.) They also claim that government-mandated shutdowns imposed physical limits on their properties. (*Id.* at ¶¶ 20, 100-65.) Their theory is that the presence of the virus and the resulting economic shutdowns caused physical loss to covered property. (*Id.* at ¶¶ 93, 178, 182-85, 200, 214.)

The critical policy terms here are the words *direct accidental physical loss* and *direct accidental physical damage*. Though the policies do not define them, these are common, unambiguous words. *See Santo's Italian Cafe LLC v. Acuity Ins. Co.*, --- F. 4th ---, No. 21-3068, 2021 WL 4304607, at *2 (6th Cir. Sept. 22, 2021). The Court will focus on the phrase "direct physical loss," and specifically the word "loss." "Loss" means "destruction, ruin; the partial or complete deterioration or absence of a physical capability or function." *Loss*, *Merriam-Webster*, https://unabridged.merriam-webster.com/collegiate/loss. The definition reveals a physical component to loss. *Destruction* and *ruin* ordinarily connote irreparable physical damage; *deterioration* usually describes a physical object's loss of

9

quality or function. And the fact that the word "physical" itself modifies the word "loss" dispels any doubt that the "loss" intended in the policy unambiguously refers to a loss that has a hard physicality to it. *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021); *Torgerson Properties, Inc. v. Cont'l Cas. Co.*, --- F. Supp. 3d ---, No. CV 20-2184, 2021 WL 615416, at *2 (D. Minn. Feb. 17, 2021). The question, then, is whether the Complaint's claims *plausibly* allege a compensable loss.

To be sure, the Complaint alleges that the virus causes "direct physical loss," including "structural alterations" and "property damage." (Am. Compl., Doc. 61, ¶¶ 32, 69, 212.) But it fails to specify *how* the virus supposedly alters structures or damages property. (*Id.* at ¶¶ 59, 184, 212, 242.) Plaintiffs also claim that the government closure orders caused "direct physical loss or damage." (*Id.* at ¶ 11.) The effect that both the virus and the closure orders had on the insured properties was that it made them "unusable in a way that [they] had been used before the COVID-19 pandemic." (*Id.*)

As an initial point, the claim that the virus causes "structural alterations" and "property damage" strains the plausibility requirement to its breaking point. A court need not set aside common sense when reading complaints. *16630 Southfield Ltd.*, 727 F.3d at 504. And, here, it defies common sense to hold that a microscopic virus structurally alters or tangibly damages physical property—especially in light of Plaintiffs' own acknowledgments that the virus can be eliminated with disinfectant and goes away naturally after a few days. (Am. Compl., Doc. 61, ¶ 199.) *See also Santo's Italian Café*, --- F.4th ---, 2021 WL 4304607, at *5 (noting the implausibility of the theory that a shutdown order prohibited a company and the public from having access to insured property). But,

more importantly, whether the "loss" comes by way of the virus, the disease, or government closure orders, under every applicable state's law, Plaintiffs' reading asks too much of the policy language.

### 1. Pennsylvania

Pennsylvania's closure order forced Brookside Manor to fully discontinue operations three times. It has not been able to operate at more than 10% capacity since January 2021. (Am. Compl., Doc. 61, ¶¶ 17, 192.) It has installed plexiglass screens for safety, posted signs about masks, social distancing, and sanitation, and reconfigured its space. (*Id.* at ¶ 210.)

Pennsylvania law holds that "direct physical loss . . . exists when a structure has been rendered 'uninhabitable and unusable,' causing the owner to suffer a 'distinct loss.'" *Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co.*, --- F. Supp. 3d ---, No. CV 20-2171, 2021 WL 1945712, at *6 (E.D. Pa. May 14, 2021) (quoting *Port Auth. of NY and NJ v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002)). If a structure continues to function, there is no physical loss. *Id.*; *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 624 (E.D. Pa. 2020).

Despite the burdens Brookside Manor faced, nothing in the Complaint indicates that the structure itself ceased functioning. *Hair Studio 1208*, --- F. Supp. 3d ---, 2021 WL 1945712, at *6. Discontinuing operations due to closure orders is not the same as experiencing an event that renders the property uninhabitable or unusable. Since the property continued to operate, despite contamination and temporary shutdowns, the structure clearly continued to function. *Id.* That being the case, Brookside Manor cannot

plausibly allege "direct physical loss" or entitlement to business income coverage.

### 2. New York

New York issued a mandate that required Reeds Jewelers to shut down its stores. (Am. Compl., Doc. 61, ¶ 15.) An outbreak of COVID-19 at one of its locations necessitated another closure. (*Id.*) They now operate at 50% capacity. (*Id.* at ¶¶ 15, 189.)

Under New York law, contamination of insured property by a virus "does not constitute a 'direct physical loss' because the virus's presence can be eliminated by 'routine cleaning and disinfecting.'" *Food for Thought*, --- F. Supp. 3d ---, 2021 WL 860345, at *5 (quoting *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-CV-754V, 2020 WL 7867553, at *4 (W.D.N.Y. Dec. 29, 2020)). A surface or structure that simply needs to be cleaned has not suffered a "direct physical loss." *Id.*; *Kim-Chee LLC v. Philadelphia Indem. Ins. Co.*, --- F. Supp. 3d ---, No. 1:20-CV-1136, 2021 WL 1600831, at *6 (W.D.N.Y. Apr. 23, 2021) ("In the absence of plausible allegations that the virus persists within insured premises in the manner of gasoline or other contaminants, the reduction in business activity mandated by the state shutdown orders is best described as an instance of widespread economic loss due to restrictions on human activities, not the consequence of a direct physical loss or damage to the insured premises."). In this light, then, Plaintiffs' reading of the insurance policy impermissibly collapses coverage for "direct physical loss" into "loss of use" coverage. *Northwell Health, Inc. v. Lexington Ins. Co.*, --- F. Supp. 3d ---, No. 21-CV-1104, 2021 WL 3139991, at *6 (S.D.N.Y. July 26, 2021). This is so whether the theory of loss is viral contamination of the premises or forced closure by government decree. *Kim-Chee*, --- F. Supp. 3d ---, 2021 WL 1600831, at *6. For these reasons, Reeds Jewelers has not

stated a claim for business income coverage.

### 3. Ohio

Craft & Vinyl alleges that the functionality of its physical space is impaired and has been "reduced to online sales." (Am. Compl., Doc. 61, ¶ 13.) It was completely closed for a time, and now its physical space supports an online business. It has been unable to use dining furniture and has lost the use of substantial entertaining and dining space. (*Id.* at ¶ 186.) Similarly, Swearingen Smiles was forced to temporarily close its dental office, resulting in substantial losses. It eventually reopened on a limited basis. (*Id.* at ¶ 187.)

In Ohio, common words in a contract bear their plain and ordinary meaning unless a manifest absurdity results or the contract clearly intends some other meaning. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 148 (1978). Courts applying Ohio law have found that the contractual term "physical loss" is consistent with material or perceptible harm and excludes intangible losses. *E.g., Santo's Italian Café*, --- F. 4th---, 2021 WL 4304607, at *2; *Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.*, --- F. Supp. 3d ---, No. 2:20-CV-2035, 2021 WL 858489, at *6 (S.D. Ohio Mar. 8, 2021) (quoting *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1143 (Ohio Ct. App. 2008) (in turn quoting 10A Couch on Insurance (3d Ed. 1998), § 148:46)). Accordingly, "physical loss of" property means "material, perceptible destruction or deprivation of possession." *MIKMAR, Inc. v. Westfield Ins. Co.*, --- F. Supp.3d ---, No. 1:20-CV-01313, 2021 WL 615304, at *5 (N.D. Ohio Feb. 17, 2021).

Based on the above, the Ohio plaintiffs have not pled a claim for coverage. Although Craft & Vinyl no longer uses its space for dining and entertaining, it does use

13

it for another commercial purpose: supporting an online business. These facts do not establish any kind of destruction or deprivation of possession and, accordingly, fall outside the scope of "direct physical loss." The same is true of Swearingen Smiles, which suffered no destruction or loss of possession of its property. And the shutdown order did not damage or change the property in such a way that required repair or precluded future use. *See Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021).

As the Sixth Circuit has recently affirmed, "[a] loss of use simply is not the same as a physical loss." *Santo's Italian Café*, --- F. 4th---, 2021 WL 4304607, at *3. It is not manifestly absurd for certain events to fall outside insurance coverage and, here, no manifest absurdity results in finding that intangible economic injuries do not qualify as "direct physical loss." *MIKMAR*, 2021 WL 615304, at *5. For these reasons, the Ohio plaintiffs fail to plausibly raise a claim for business income coverage.

### 4. Illinois

Chicago Magic Lounge was forced to close in March 2020. (Am. Compl., Doc. 61, ¶ 191.) It installed plexiglass and air filters but remains "temporarily closed." (*Id.* at ¶ 203.)

A federal court applying Illinois law reasoned that the "plain wording of the phrase ['direct physical loss or damage'] requires either a permanent disposition of the property due to a physical change ('loss'), or physical injury to the property requiring repair ('damage')." *Crescent Plaza Hotel Owner L.P. v. Zurich Am. Ins. Co.*, --- F. Supp. 3d ---, No. 20 C 3463, 2021 WL 633356, at *3 (N.D. Ill. Feb. 18, 2021). Though Chicago Magic

14

Lounge remains temporarily closed, it has not alleged facts that amount to a permanent disposition of the property due to a physical change. As Illinois courts have observed, the words "direct" and "physical" — which modify the word "loss" — ordinarily indicate "actual, demonstrable harm of some form to the premises itself," not "forced closure of the premises for reasons extraneous to the premises themselves, or adverse business consequences that flow from such closure." *Id. See also Sandy Point Dental*, 488 F. Supp. at 693. Accordingly, Chicago Magic Lounge's circumstances do not amount to a "direct physical loss" under Illinois law. For that reason, it fails to articulate a claim for business income coverage under their policy.

### 5. Minnesota

Burning Brothers closed operations twice. Its business has been reduced to selling beer to go and serving customers at a reduced capacity. It has resumed in-person operations but has been unable to use insured property as it was intended to be used. (Am. Compl., Doc. 61, ¶¶ 13, 190.)

The law of Minnesota recognizes that structural alteration is not always necessary to qualify for "direct physical loss" coverage. *Seifert v. IMT Ins. Co.*, 495 F. Supp. 3d 747, 751 (D. Minn. 2020). But it distinguishes between some non-structural harms and others. If the claims involve property that cannot be used for its intended purpose, "[a]ctual physical contamination of the insured property is still required." *Id.* For example, a business premises may suffer a "direct physical loss" if it is contaminated by asbestos, *see Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997), pesticides, *see General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152

15

(Minn. Ct. App. 2001), or smoke, *see Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 290 (Minn. 1959). *See also Seifert*, 495 F. Supp. 3d at 751.

The presence of SARS-CoV-2, however, is not like asbestos, pesticides, or smoke. *See Torgerson Properties*, --- F. Supp. 3d ---, 2021 WL 615416, at *2. The latter contaminants may seriously impair or destroy a property's function and value. *See, e.g., Sentinel*, 563 N.W.2d at 300. The virus, by contrast, is "easily eliminated with routine cleaning procedures." *Bachman's*, --- F. Supp. 3d ---, 2021 WL 981246, at *4. It does not utterly incorporate with other material, like pesticides do, *see General Mills*, 622 N.W.2d at 150, or render a property useless, like asbestos can, *see Sentinel*, 563 N.W.2d at 300. Indeed, the Complaint acknowledges that the virus, if not eliminated with cleaning, goes away naturally after a period of days. (Am. Compl., Doc. 61, ¶¶ 73, 199.) A recent Eighth Circuit case—though suggesting in dicta that "physical contamination" could potentially qualify as a "physical loss"—did not depart from the principle that the contamination must seriously impair or destroy a building's function before it constitutes coverable loss. *Compare Oral Surgeons*, 2 F.4th at 1144 *with Torgerson Properties*, --- F. Supp. 3d ---, 2021 WL 615416, at *2.

Furthermore, it was not primarily the presence of the virus on the premises that closed the properties or stopped people from visiting them—it was the executive orders meant to slow down the spread of the virus. *Torgerson Properties*, --- F. Supp. 3d ---, 2021 WL 615416, at *2. And, because "mere loss of use or function" is not a "direct physical loss," the policy language does not cover losses related to government closure orders. *Id.* (quoting *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613, 616 (8th Cir. 2005)).

16

For these reasons, Burning Brothers fails to state a claim for business income coverage.

### 6. West Virginia

Eleisha Nickoles, DDS, had to reduce operations at and temporarily close her dentistry office. (Am. Compl., Doc. 61, ¶¶ 14, 188.) Three of her employees tested positive for COVID-19 and she installed several air purifiers, air filters, and plexiglass barriers. (*Id.* at ¶¶ 194, 201, 206.)

The law of West Virginia, like Minnesota, recognizes that "direct physical loss 'may exist in the absence of structural damage to the insured property.'" *Uncork & Create*, 498 F. Supp. 3d at 883–84. The physical threat of rockfalls, for instance, may render property uninhabitable. *Id.* (citing *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W. Va. 1998)). The novel coronavirus, however, "has no effect on the physical premises of a business." *Id.* That is true even when the virus is physically present on the premises, because the virus "does not threaten the inanimate structures covered by property insurance policies." *Id.* at 883-84. The fact that the virus can be eliminated with disinfectant drives this point home. *Id.* Consistent with this reasoning, government closure orders—which do not physically damage or render insured property unusable or uninhabitable—do not constitute "direct physical loss" either. *Id.* at 884. Consequently, Nickoles too fails to plausibly allege entitlement to business income coverage.

### 7. Other considerations

The contracts contain another indication that the loss needs to be physical: the defined term, "period of restoration." Key to the business income provision is that Cincinnati's liability is tied to loss of business income during a "period of restoration."

(E.g., Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3011.) "Period of restoration" means the "period of time" that begins at the time of direct "loss" and ends on the earlier of:

(1) The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

(*Id.* at Pg. ID 3031-32.) A physical "loss," then, requires restoration. Restoration, under the policy, involves repair, rebuilding, or replacement—if not an entirely new permanent location. The policy's reference to repairs, rebuilding, replacements, and new locations "assumes physical alteration of the property, not mere loss of use." *Oral Surgeons*, 2 F.4th at 1144. To construe "direct physical loss" to cover intangible losses (such as these economic losses) would render much of the "period of restoration" definition nonsensical, because "intangible losses cannot be repaired, rebuilt, or replaced." *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 508 F. Supp. 3d 186, 199 (N.D. Ohio 2020). *See also Newchops*, 507 F. Supp. 3d at 624.

No other state law wrinkle compels a different outcome here. Plaintiffs note that some states handle contractual ambiguities differently. But the words here are not ambiguous. *E.g., Oral Surgeons*, 2 F.4th at 1144. To the extent the reasonable expectations doctrine applies, it does not avail the Pennsylvania or West Virginia plaintiffs. In West Virginia, that doctrine generally only applies to ambiguous contracts. *Luikart v. Valley Brook Concrete & Supply, Inc.*, 613 S.E.3d 896, 903 (W. Va. 2005). In limited circumstances, West Virginia courts have applied it to clear and unambiguous contracts, *see id.*, but Plaintiffs fail to show why it should apply here.

Pennsylvania's reasonable expectations doctrine is admittedly broader but not broad enough to save Brookside Manor's claim from dismissal. The language of the insurance policy is usually the best indicator of the parties' reasonable expectations. Nevertheless, a court must examine the totality of the insurance transaction to ascertain the insured's reasonable expectations. *Humans & Resources, LLC v. Firstline Nat'l Ins. Co.*, 512 F. Supp. 3d 588, 603 (E.D. Pa. 2021). So, do the circumstances of COVID-19 and the governmental closure orders qualify for coverage under the reasonable expectations doctrine? Federal courts in Pennsylvania have gone both ways. In *Humans & Resources*, the court found that the plaintiff plausibly alleged business interruption coverage when the complaint expressly alleged, among other things, that the plaintiff "had a reasonable expectation" that the relevant coverage applied. *Id.* at 603-04. But in *Moody v. Hartford Financial Group*, the same court dismissed a suit based in part on the plaintiff's failure to plead facts suggesting that the insurer had created a reasonable expectation of coverage. --- F. Supp. 3d ---, No. CV 20-2856, 2021 WL 135897, at *7 (E.D. Pa. Jan. 14, 2021). And, in *Lansdale 329 Prop, LLC v. Hartford Underwriters Ins. Co.*, the court applied the *Moody* reasoning in dismissing a complaint that failed to raise facts that supported application of the reasonable expectations doctrine, such as representations by the insurer or expectations of the insured. --- F. Supp. 3d ---, No. CV 20-2034, 2021 WL 1667424, at *12 (E.D. Pa. Apr. 28, 2021).

This case falls in line with *Moody* and *Lansdale*. Nowhere do Plaintiffs allege that they had a reasonable expectation that losses associated with viral contamination or government shutdown orders would qualify as "direct physical loss." And, independent

19

of any analogy to those cases, another reason warrants dismissal: the "period of restoration" provision. That term's reference to repairs, rebuilding, replacements, and, alternatively, resuming business at a new permanent location—all activities indicating that "loss" refers to some kind of hard physical change or ruin to the covered property— removes any doubt that Brookside Manor could have had a reasonable expectation that an intangible loss would constitute "direct physical loss."

As unfortunate as Plaintiffs' COVID-19-related business losses are, their preferred construction of their insurance contracts simply cannot contend with the plain and ordinary meaning of "direct physical loss." Neither government closure mandates nor the presence of the virus or disease in insured property constitutes a "direct physical loss." Accordingly, Plaintiffs have not stated a claim for business income coverage.

### III. Civil Authority Coverage

Cincinnati owes Plaintiffs "Civil Authority" coverage in the event that a "Covered Cause of Loss causes damage to property other than Covered Property" and an "action of civil authority . . . prohibits access" to the insured property. (Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3012.) Other conditions also apply, including that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage." (*Id.*)

Civil authority coverage thus requires at least three things. First, something must cause damage to property other than the insured property. Second, a civil authority must prohibit access to the insured location. Third, a civil authority must also prohibit access to the area surrounding the "damaged property." (*Id.*)

20

Plaintiffs allege that they are each located in the proximity of hospitals where COVID-19 was present. (Am. Compl., Doc. 61, ¶¶ 166-74.) The presence of the virus and the disease, they allege, caused "physical damage" at those properties. (*Id.* at ¶ 174.) But for the same reasons that viral contamination of the insured property does not constitute direct physical loss or damage, *see supra* 9 – 20, the virus or the disease at neighboring property does not either. *E.g.*, *L&J Mattson's Co. v. Cincinnati Ins. Co., Inc.*, --- F. Supp. 3d ---, No. 20 C 7784, 2021 WL 1688153, at *7 (N.D. Ill. Apr. 29, 2021); *Rye Ridge Corp. v. Cincinnati Ins. Co.*, --- F. Supp. 3d ---, No. 20 CIV. 7132, 2021 WL 1600475, at *3 (S.D.N.Y. Apr. 23, 2021); *MIKMAR, Inc*, --- F. Supp.3d ---, 2021 WL 615304, at *9. Without "damage to property," there can be no civil authority coverage. Since Plaintiffs have not plausibly alleged "damage to property"—a necessary element to civil authority coverage—they fail to state a claim for such coverage.

## IV. Extra Expense Coverage

The policies require Cincinnati to pay the extra expenses an insured sustains during a "period of restoration." (E.g., Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3012.) "Extra Expense" refers to necessary expenses an insured incurs during the "period of restoration" that the insured would not have sustained "if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (*Id.*)

Extra Expense coverage is thus tethered, like Business Income coverage, to a direct loss. As there was no direct loss here, Plaintiffs have not plausibly alleged entitlement to Extra Expense coverage.

V.     **Sue and Labor Coverage**

The policies contain a section entitled "Duties in the Event of Loss or Damage." (E.g., Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3023.) It provides that, in the event of "loss" to insured property, an insured "must see that [a list of duties] are done in order for coverage for apply." (*Id.*) Plaintiffs characterize this section as providing for "Sue and Labor" coverage. (Am. Compl., Doc. 61, ¶¶ 29, 67.) Cincinnati argues that the Sue and Labor provision is not even coverage, but a condition of the policies; and, even if it was coverage, it would not apply here because there is no covered loss.

Cincinnati is correct. First, the "Duties" section is preconditioned on the event of a "loss." (E.g., Craft & Vinyl Policy, Doc. 61-1, Pg. ID 3023.) As there is no loss, this section does not apply. Second, the "Duties" section does not describe coverage—rather, it lays out an insured's obligations to ensure that separate coverage applies. Third, nothing in the "Duties" section sets forth a duty for Cincinnati to pay. *See In re Society Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, --- F. Supp. 3d ---, No. 20 C 02005, 2021 WL 679109, at *12 (N.D. Ill. Feb. 22, 2021).

For these reasons, Plaintiffs have failed to state a claim for Sue and Labor coverage.

## CONCLUSION

Plaintiffs have weathered more than their fair share of the unfortunate circumstances that the COVID-19 pandemic has caused. For the reasons above, however, nothing in their insurance policies plausibly provides for the coverage they seek here. Accordingly, the Court **GRANTS** the motion to dismiss and **DENIES** the motion to stay as moot. The Court **TERMINATES** the following cases:

22

(1) *Troy Stacy Enterprises, Inc., et al. v. Cincinnati Insurance Company, et al.*, 1:20-cv-312;

(2) *Swearingen Smiles LLC, et al v. Cincinnati Insurance Company, et al.*, 1:20-cv-517;

(3) *Reeds Jewelers of Niagara Falls, Inc. v. Cincinnati Insurance Company*, 1:20-cv-649;

(4) *Burning Brothers Brewing LLC, et al. v. Cincinnati Insurance Company*, 1:20-cv-920.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND